UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| RPG Receivables Purchase Group, Inc., <br><br> Plaintiff, <br><br> v. <br><br> WKW Erbsloeh North America, LLC, and WKW Erbsloeh North America Holding, Inc., <br><br> Defendants. | Case No.: 4:17-cv-01916-CLM |

## MEMORANDUM OPINION

When Butcher Industrial Finishings, Inc. ("Butcher") shuttered its business in March 2017, (at least) two of its partners were left holding the bag: plaintiff RPG Receivables Purchase Group ("RPG") and defendant WKW Erbsloeh North America ("WKW"). There is no genuine, material dispute that WKW holds the heavier bag of losses; thus, WKW is entitled to summary judgment.

### FACTUAL BACKGROUND

WKW is a Pell City, Alabama, business that supplies car parts to BMW for use in BMW's X5 SUV. Before 2016, WKW finished certain trim pieces by using a "black anodized" process. BMW, however, preferred a black painted finish and was willing to pay more for painted parts. WKW was not equipped to paint the pieces; so, in January 2016, WKW contracted with Ontario-based Butcher to receive

1

WKW's unfinished trim pieces, paint them black, and then return them to WKW for ultimate shipping to BMW ("the Supply Agreement"). Relevant here, the Supply Agreement required Butcher to (a) ensure that it could timely produce the agreed-upon capacities of painted parts (*see* Supply Agreement §8.1), and (b) give WKW six months-notice before terminating the Agreement. *See* Supply Agreement §10.1.

In December 2016, Butcher assigned its accounts receivable to RPG, meaning that RPG collected the monies owed Butcher under the Supply Agreement.

On March 8, 2017—without the requisite six-month notice—Butcher informed WKW that it was shutting down its operation. Butcher invoiced WKW in the amount of $468,991.99 for the work it had performed up to point.

As Butcher's assignee, RPG filed the present case to recover the $468,991.99 that Butcher invoiced WKW. In defense, WKW claims that it lost more than $1.4 million due to Butcher's abrupt closure and that the Supply Agreement allows WKW to "set off" its losses from the amount it was invoiced—meaning that WKW owes Butcher nothing. Both parties have moved for summary judgment.

## STANDARD OF REVIEW

Alabama state law governs the Court's review of the Supply Agreement. *See* Supply Agreement § 12.1 (choice of law provision).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**ANALYSIS**

Three key points are undisputed: (1) WKW owed Butcher $468,991.99 for work done before the shutdown; (2) against that amount, the Supply Agreement allows WKW to set-off the amount of monies WKW validly claims against Butcher; and, (3) the Supply Agreement's terms apply to RPG, as Butcher's assignee. *See* Doc. 36-1 at 30, §16(d) ("Buyer may set-off against amounts payable to Seller any indebtedness or claim which Buyer or its affiliates may have against Seller or its affiliates"); Ala. Code § 7-9A-404(a)(1) ("the rights of an assignee are subject to all terms of the agreement between the account debtor and assignor").

As a result, this case boils down to how much WKW may set off against RPG's claim for $468,991.99. WKW claims that the undisputed facts establish a set-off that exceeds $1.4 million. RPG disagrees. Because the parties' motions seek summary judgment, the pertinent question is therefore: Is there a genuine issue of material fact whether WKW is entitled to set off more than $468,991.99?

In its motion for summary judgment, WKW claims that it presented undisputed evidence regarding the following claims against Butcher:

| Replacement-related "cover costs" | |
|---|---|
| Lost profit (*i.e.* monies lost during the period that WKW reverted to the black anodized process) | $1,059,814.88 |
| Tooling Costs (*i.e.* monies WKW spent to fabricate tooling for use with Butcher's replacement) | $99,450.00 |
| Research and Development Costs (*i.e.* monies spent to ensure that parts finished by Butcher's replacement met BMW's standards) | $27,782.63 |
| Travel costs (*i.e.* cost of travel to Butcher's replacement's facility) | $21,500.88 |
| Claims predating Shutdown | |
| Defective parts (*i.e.* monies BMW deducted from payments to WKW due to defective parts) | $79,571.42 |
| Open chargebacks (*i.e.* parts that WKW received from Butcher that did not meet WKW specifications) | $14,407.08 |
| Shutdown-related costs | |
| Unpaid shipping costs (*i.e.* WKW's settlement of shipping costs Butcher failed to pay a third-party shipper) | $40,000.00 |
| Unfinished parts (*i.e.* parts left at the Butcher plant that could not be sold to BMW) | $58,654.15 |
| Shipping of usable parts (*i.e.* parts left at the Butcher plant that could be anodized and sold to BMW) | $3,370.03 |
| **Total** | **$1,404,551.07** |

*See* Doc. 35 at 7-12 (*citing* Doc. 36-1 at 33 (Kroell Declaration, Attachment C)). RPG counters that each of these amounts is disputed, *see* Doc. 37 at 5-10, and that trial is necessarily to determine the proper amounts.

Accordingly, the Court must determine whether RPG's arguments against a set-off present a genuine issue of material fact. As previously stated, a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court begins and ends its inquiry with the largest category of WKW's set-off claims: $1.059 million of profits lost due to WKW's temporary reversion to anodizing parts. As detailed below, if a reasonable jury viewed the evidence, that jury could not return a verdict in favor of RPG because—even considering RPG's arguments/disputes—the amount of monies that WKW lost as a result of Butcher's breach far exceeds the $468,991.99 that WKW owed Butcher.

**I.     There is no genuine issue of material fact that WKW is entitled to a set-off that exceeds $468,991.99.**

It is undisputed that when Butcher terminated the Agreement in March 2017, WKW had to find a replacement supplier to paint its trim pieces, so that WKW could meet its contractual obligations with BMW. It is also undisputed that, while WKW searched for a new paint supplier, BMW agreed to allow WKW to revert to the less-desirable "black anodized" process, which WKW could perform at its own facility,

but BMW would pay WKW less for each anodized part than BMW had been paying WKW for each painted part.

Alabama law allows WKW to set off the difference between (a) what WKW would have made if Butcher had continued painting WKW's trim pieces and (b) what WKW actually made under its post-termination agreement with BMW to produce black anodized pieces. *See* Ala. Code § 7-2-712. WKW has produced testimonial and documentary evidence from its controller, Thomas Kroell, that this difference—which RPG labels "lost profits" and WKW calls actual, direct "cover costs"—equals $1,059,814.88. *See* Doc. 36-1 (Exhibit A and attachments).

RPG disputes WKW's lost profit number for various reasons, which the Court addresses below.

**A. There is no genuine issue of material fact whether WKW materially breached its agreement with Butcher before Butcher's shutdown.**

RPG first argues that Alabama law bars WKW from claiming a set-off because WKW materially breached the Supply Agreement in two ways before Butcher breached the Agreement by shutting down operations. *See* Doc. 37 at 15-16 (*citing* Blake v. Bank of Am., N.A., 845 F. Supp. 2d 1206, 1211 (M.D. Ala. 2012); *Gray v. Reynolds*, 553 So. 2d 79, 82 (Ala. 1989)).

First, RPG claims that WKW violated the following provision of the Supply Agreement because WKW admits that it supplied Butcher with parts that possessed various imperfections:

> Pricing will be firm for 90 days. Pricing is in U.S. Funds, FOB Butcher Industrial Finishings Inc. Brampton, unless otherwise listed. ***Pricing is based on material being received 100% defect free—no rust or manufacturing defects***. Pricing is based on material being processed during normal plant operating hours.

Doc. 33-1 at 11 (emphasis added). But the plain language of this provision shows that the presence of defects merely affects "pricing;" it would not constitute a material breach of the contract that permitted termination by Butcher. This plain interpretation is bolstered by Section 2(d) of the same document, which allows Butcher to charge or impose a fee against WKW for "nonconforming parts." *Id.* It's also bolstered by common sense, as it is difficult to imagine that any commercial contract requiring shipment of the quantity of parts involved here would not contemplate the possibility of some defects. Accordingly, even if the Court accepts WKW's failure to provide "100% defect free" parts as a proven fact, WKW did not commit a material breach that precludes WKW from claiming a set-off.

Furthermore, it is undisputed that, despite receiving imperfect parts, Butcher continued working with WKW until Butcher shutdown in March 2017. Alabama law provides that a party cannot excuse its own breach of contract by relying on the other party's earlier breach, if the later-breaching party accepts the first party's non-conforming conduct and continues to perform under the contract. *See Edwards v. Allied Home Mortg. Capital Corp.*, 962 SO. 2d 194, 207-08 (Ala. 2007); *Valley Timber Sales, Inc. v. Midway Forest Prods., Inc.*, 563 So. 2d. 612 (Ala. Civ. App.

1990). Applying that law here means that RPG cannot rely on WKW's alleged breach to avoid Butcher's later breach, because Butcher continued working with WKW rather than terminating the Agreement due to WKW's alleged breach.

RPG's second argument for a material breach stems from WKW's alleged failure to supply Butcher with an adequate number of parts, *see* Doc. 37 at 16, a factual allegation that WKW disputes. A review of the correspondence cited by RPG to support its claim indicates little more than the sort of back-and-forth about shipments, supplies, and delivery problems that would be expected in the ordinary course of business. There is nothing to indicate that WKW so failed to supply raw parts as to make its arrangement with Butcher unworkable or that would constitute a material breach of the Supply Agreement.

That said, even if the Court accepts that WKW supplied a deficient number of parts to Butcher, RPG's argument still fails. Butcher continued working with WKW through its shutdown in March 2017, despite the deficient shipments. As previously stated, RPG cannot claim a material breach after the fact when Butcher did not raise the issue at the time of the alleged breach.

Accordingly, the Court finds that WKW did not materially breach its Agreement with Butcher before the latter party ceased operations in March 2017; thus, WKW is not precluded from asserting its contractual right of set-off.

**B. There is no genuine issue of material fact whether WKW reasonably responded to Butcher's shutdown.**

Alabama law states that the party aggrieved by a breach (WKW here) "may 'cover' by making in good faith and without unreasonable delay any reasonable purchase or contract to purchase the goods in substitution of those due from the seller." Ala. Code. § 7-2-712(1). RPG claims that, once Butcher breached the Supply Agreement in March 2017, WKW acted "unreasonably," thereby precluding WKW from setting off the profits that it lost while searching for a replacement for Butcher. *See* Doc. 37 at 16-20.

WKW counters that (a) RPG waived its failure-to-mitigate defense by failing to raise it before motions for summary judgment and/or (b) RPG failed to produce sufficient evidence to prove that WKW's mitigation efforts were unreasonable. Doc. 41 at 6-7 (*citing Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1286 (11th Cir. 2000); *Avco Fin. Servs. v. Ramsey*, 631 So. 2d 940, 942 (Ala. 1994)). The Court does not rule on WKW's waiver argument because the Court agrees with WKW that RPG has failed to present evidence that could persuade a reasonable jury that WKW acted unreasonably in the months following Butcher's breach.

1. <u>Failure to have an alternate on standby</u>: RPG alleges that WKW had begun looking for alternate suppliers seven months before Butcher terminated its agreement (*see* Doc. 37 at 18), and that WKW "obtained financial information demonstrating Butcher as a low credit recommendation with high likelihood of

9

business closure" the month before Butcher closed. *Id.* at 19. Based on these alleged facts, RPG argues that a reasonable jury could find that "WKW failed to act reasonably in delaying or being unable to establish its alternate suppliers sooner." *Id.* at 20.

Even if RPG is right on the facts—which WKW disputes—RPG's argument fails. Neither Alabama law nor the Supply Agreement required WKW to have an alternate supplier on standby, just in case Butcher breached the Supply Agreement. To the contrary, the Supply Agreement required Butcher provide a written notice of termination six months in advance, *see* Supply Agreement §10.1, ostensibly to allow WKW six months to find a replacement. The undisputed evidence shows that WKW replaced Butcher less than six months after receiving Butcher's notice of termination, demonstrating that WKW acted reasonably under the Agreement.

2. <u>Rejection of Butcher's offer to continue</u>: In its March 8th written notice of closure, Butcher offered to provide services to its customers, including WKW, on a short-term basis. RPG claims that it was unreasonable for WKW to reject this short-term offer and instead make a deal with BMW to revert to producing black anodized parts until Butcher's replacement could be up and running. *See* Doc. 37 at 19-20. RPG claims that, for WKW's actions to be deemed "reasonable," WKW "should have accepted this offer for as long as possible." *Id.* at 20. This argument fails because it is based on speculation and conjecture. *See Blackston v. Shook and*

10

*Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (stating that, when considering a motion for summary judgment, "[a]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable").

As its sole evidence in support of the argument, RPG cites to the deposition of Butcher's general manager, Brian Bunn, who testified that two of Butcher's other customers accepted the offer. Doc. 37 at 19, n.8 (*citing* Doc. 33-5 at 180-181). On the same pages that RPG cites, Mr. Bunn also testified that (a) Butcher spoke to WKW about the offer once, on March 9th, and (b) just six days later, Butcher was evicted from the premises by its receiver. Doc. 33-5 at 179-81.

Taking Mr. Bunn's testimony as true, Butcher would have had a maximum of six days to work on WKW orders—and that's assuming that (a) WKW would have immediately said yes to Butcher's offer during the March 9th phone call and (b) Butcher would have been allowed use of its facilities through March 16th. RPG offers no evidence of how many sets Butcher could have completed during that short window, and thus it is impossible to determine how much of WKW's $1.059 million in lost profits—which accrued over a span of approximately four months—Butcher could have salvaged.

Again, "speculation and conjecture" cannot be as the basis to deny summary judgment. *Blackston*, 764 F.2d at 1482. Accordingly, the Court finds that Mr. Bunn's

testimony does not create a genuine issue of material fact that would defeat WKW's motion for summary judgment regarding lost profits/cover costs.

3. <u>Failure to negotiate with BMW</u>: Finally, RPG argues that WKW acted unreasonably by failing to negotiate a better price for black anodized parts from BMW. Doc. 37 at 19-20. RPG's argument is limited to one sentence, which cites the deposition testimony of WKW's controller, Thomas Kroell, for the proposition that WKW accepted BMW's price "from a previous project two years before the deviation with no apparent negotiation." *Id.* (citing Kroell depo. at 32:13-33:15). The Court rejects this argument for two reasons.

First, it mischaracterizes Kroell's testimony. Kroell testified that he *believed* (but was not certain) that BMW paid the same price for anodized pieces before and after Butcher's involvement because that was standard practice. Specifically, Kroell testified that "normally we do not do an annual price review because we cannot go back to BMW and say, hey, we need a better price." Kroell depo. at 33:12-14.

Second, RPG failed to present any evidence what "better price" BMW would have accepted had WKW attempted negotiations and thus failed to show what amount of WKW's lost profits should be deducted.

As a result, RPG's argument is based on two steps of speculation: (1) BMW would have allowed WKW to negotiate a better price, contrary to BMW's standard practice, and (2) that better price would have cut WKW's profit loss from $1.059

12

million to less than $468,991.99 (*i.e.* the amount of RPG's claim). As previously stated, conjecture and speculation are insufficient to avoid summary judgment.

### C. There is no genuine issue of material fact that WKW lost more than $468,991.99 in profits during the first few months after Butcher's shutdown.

WKW offers evidence from its controller Thomas Kroell to prove that it lost $1,059,814.88 in profits during the four-month period that it reverted to the black anodized process. RPG levies several attacks on this evidence, which the Court discusses in turn. But, before it does, the Court notes one fact that RPG does not dispute, in any of its filings: WKW lost more than $468,991.99 in profits due to the temporary reversion from black painted parts to black anodized parts. That no one disputes that WKW lost more money in the four months after Butcher's closure than the amount that WKW owed Butcher at the time of closure (*i.e.* $468,991.99) is a clear indication that summary judgment—rather than trial—is appropriate.

1. <u>Expert testimony</u>: RPG first argues that the Court should strike Kroell's evidence regarding WKW's lost profits because Kroell is not qualified to testify as a "lost profits expert" under Rule 702 of the Federal Rules of Evidence. *See* Doc. 33 at 16-19.

The Court finds, however, that Kroell presents lay testimony under Rule 701, not expert testimony under Rule 702. Kroell has not opined regarding projected/ potential future losses; he calculated a concrete number for a finite time in the past.

13

And he did so in a straightforward manner—*i.e.* he used business records to subtract the amount WKW made by selling anodized parts to BMW (*i.e.* price minus costs) from the amount WKW would have made by selling Butcher-painted parts to BMW (*i.e.* price minus costs). Courts routinely permit business employees to testify regarding such calculations under Rule 701, as noted by the Rules Committee:

> most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Fed. R. Evid. 701 advisory committee notes to 2000 amendments.

The Court finds that Kroell's testimony regarding the monies WKW lost due to its reversion to the black anodized process would be admissible at trial under Rule 701 because Kroell's testimony is based on his particularized knowledge of WKW's business, not on scientific, technical, or some other specialized analysis of projecting lost profits, as required by Rule 702.

Relatedly, the Court denies RPG's request to hire an expert to rebut Kroell's testimony. Doc. 33 at 19. For the reasons stated above, Kroell would not testify as an expert, thus RPG does not require an expert to rebut Kroell's testimony. And, because WKW has not offered an expert witness, any expert designated by RPG would be an initial expert. RPG did not disclose any expert before the court-

mandated deadline, which the Court extended three times. *See* Docs. 19, 22, 24, 26. The Court finds no good cause for another extension. *See Tuscumbia City Sch. Sys. v. Pharmacia Corp.*, 2014 WL 12605648, at *1 (N.D. Ala. 2014) ("[w]here a party attempts to designate as a 'rebuttal' expert someone whose proposed testimony is beyond the scope of appropriate rebuttal, that witness may be viewed as an initial expert who was not timely designated and whose testimony may be struck by the Court for violating Rule 26(a) and the Court's governing scheduling order.").

    2.    <u>Heightened standard of review</u>: RPG argues that Kroell's testimony should be disregarded because he cannot calculate WKW's lost profits to a "reasonable degree of certainty." *See*, *e.g.*, Doc. 33 at 2, 19-20. But Alabama law differentiates between "general" lost profits and "consequential" lost profits. *See Mannington Wood Floors, Inc. v. Port Epes Transport, Inc.*, 669 So.2d 817, 822-23 (Ala. 1995). In a case such as this, where the party seeks only to be placed in "the position he would have been in had the contract been fully performed," Alabama law treats lost profits as a "general" direct loss that is not subject to the heightened reasonable degree of certainty standard. *Id.* Instead, a party produces sufficient evidence of general lost profits "if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss." *Id.* at 822. Importantly for RPG's remaining argument, outlined below, "[i]n computing damages for breach of contract, a jury need not achieve 'mathematical precision.'

15

Indeed, 'the uncertainty which prevents a recovery is uncertainty as to the *fact* of the damage and not as to its *amount*.'" *Id.* (*quoting United Bonding Ins. Co. v. W.S. Newell, Inc.,* 232 So.2d 616, 624 (1969)).

      3.     <u>Mathematical errors</u>: RPG's remaining argument is that Kroell made various errors in calculating the $1,059,814.88 figure. *See* Doc. 37 at 27-31. The Court has reviewed each of RPG's alleged errors, each of WKW's responses, and Kroell's testimony and tends to agree with WKW that Kroell's calculations are accurate and thus no genuine issue of material fact exists.

      But even assuming that RPG has identified an error in Kroell's calculation that would reduce WKW's profit loss,[1] WKW would still be entitled to summary judgment because RPG has not disputed—and has not presented any evidence that would disprove—two key points: (1) WKW lost money when it reverted to the black anodized process between March and July 2017, and (2) the amount of that loss exceeded $468,991.99 (*i.e.* the amount of RPG's claim). The mathematical errors alleged by RPG, at most, would reduce Kroell's lost profits total by several thousand dollars. But, viewing Kroell's testimony in any light, there is no genuine issue of material fact whether Kroell's calculation overestimated WKW's lost profits by $590,822.89—*i.e.* the difference between RPG's claim ($468,991.99) and WKW's

---

[1] Kroell admits to one mistake that **under**estimates WKW's loss by $125,000. *See* Doc. 36-1, ¶ 10, n.1

claimed set-off for lost profits ($1,059,814.88). Nor has RPG claimed that Kroell made a $590,000+ error.

Again, Alabama law does not require lost profits to be calculated with "mathematical precision." *Mannington Wood Floors, Inc.*, 669 So.2d at 822. Instead, 'the uncertainty which prevents a recovery is uncertainty as to the *fact* of the damage and not as to its *amount*.'" *Id.* Here, there is no genuine issue that WKW *in fact* suffered a loss. Nor is there a genuine issue that the loss exceeded the $468,991.99 claimed by RPG. Accordingly, WKW is entitled to summary judgment on its set-off defense based solely on the lost profits/cover costs. The Court thus pretermits discussion of the remaining categories of WKW's set-off.

## II. WKW is entitled to summary judgment on each of RPG's claims.

Once it is determined that WKW's set-off exceeds the total value of RPG's claims, summary judgment on each of RPG's claims becomes academic.

<u>Count 1 (Breach of Contract)</u>:

To prove a breach of contract, RPG must establish (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So.3d 1258, 1267 (Ala.2011). RPG fails to establish three of the four elements.

As set forth in Part I(A) of this opinion, there is no genuine issue of material fact that Butcher—not WKW—materially breached the Supply Agreement. Thus,

17

RPG cannot prove the second (Butcher's performance) and third elements (WKW's non-performance) of its claim.

As set forth in Part I(C) of this opinion, there is no genuine material issue of fact that the amount of WKW's set-off exceeds the amount of damages claimed by RPG. Thus, RPG cannot prove the damages element.

Because RPG cannot prove three of the four requisite elements, WKW is entitled to summary judgment as to Count 1.

Count 2 (Enforcement of Security Interest):

RPG's claim to enforce its security interest fails for similar reasons. RPG acknowledges that WKW may claim a set-off against RPG as Butcher's assignee if Butcher (not WKW) committed the material breach of the Supply Agreement. *See* Doc. 37 at 14. As detailed in Part I of this opinion, there is no genuine issue of material fact that (a) Butcher, not WKW, breached the Supply Agreement, and (b) WKW's set-off exceeds the amount that WKW owed Butcher. Accordingly, WKW is entitled to summary judgment on Count II because the value of its set-off exceeds the value of RPG's security interest.

Count 3 (Quantum Meruit):

RPG claims that it is entitled to $468,991.99 based on the equitable doctrine of *quantum meruit*, which generally ensures payment for services rendered in the absence of an enforceable agreement. But it is undisputed that the services

performed by Butcher for which RPG seeks equitable compensation were performed pursuant to an enforceable written contract (*i.e.* the Supply Agreement). Because an express contract exists, RPG's claim for *quantum meruit* must fail. *See Brannan & Guy, P.C. v. City of Montgomery*, 828 So. 2d 914, 921 (Ala. 2002) ("[w]hen an express contract exists, an argument based on a *quantum meruit* recovery in regard to an implied contract fails)."

Count 4 (Unjust Enrichment):

Finally, RPG claims that WKW must pay it $468,991.99 under the equitable doctrine of unjust enrichment, which generally states that one party should not be allowed to unfairly profit at another's expense. This argument fails for two reasons. First, when an express contract exists, a legal claim for breach of contract extinguishes an equitable claim of unjust enrichment. *See Blackmon v. Renasant Bank*, 232 So. 3d 224, 228 n.4 (Ala. 2017). Second, WKW has not unfairly profited from Butcher's closure. To the contrary, there is no genuine issue of material fact that Butcher's abrupt closure cost WKW more money than WKW gained in unpaid services.

**CONCLUSION**

WKW may assert its contractual right of set-off as a defense to RPG's demand for payment of the accounts receivable that it acquired from Butcher, and there is no

genuine issue of material fact that WKW's set-off exceeds the amount of RPG's claim. WKW is therefore entitled to summary judgment on each of RPG's claims.

**DONE** this 21st day of October, 2019.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE